PUBLISH

**F I L E D**
**United States Court of Appeals**
**Tenth Circuit**

**DEC 30 2004**

## UNITED STATES COURT OF APPEALS

## TENTH CIRCUIT

**PATRICK FISHER**
**Clerk**

---

SUSAN LANMAN,

      Plaintiff - Appellant,

vs.

JOHNSON COUNTY, KANSAS,

      Defendant - Appellee.

No. 03-3316

---

**APPEAL FROM THE UNITED STATES DISTRICT COURT**
**FOR THE DISTRICT OF KANSAS**
**(D.C. No. 02-CV-2301-CM)**

---

Kirk D. Holman, Sanders, Simpson & Fletcher, L.C., Kansas City, Missouri, for Plaintiff - Appellant.

Lawrence L. Ferree, III, (Kirk T. Ridgway with him on the brief) Ferree, Bunn, O'Grady & Rundberg, Chtd., Overland Park, Kansas, for Defendant - Appellee.

---

Before **KELLY**, **HOLLOWAY**, and **LUCERO**, Circuit Judges.

---

**KELLY**, Circuit Judge.

---

      Plaintiff-Appellant Susan Lanman appeals from a grant of summary

judgment in favor of her former employer, Defendant-Appellee Johnson County

Sheriff's Department ("County") on her hostile work environment and constructive discharge claims under the Americans with Disabilities Act, 42 U.S.C. §§ 12101-12213. ("ADA").  Our jurisdiction arises under 28 U.S.C. § 1291, and we affirm.

Background

Viewing the proper summary judgment evidence[1] in the light most favorable to Ms. Lanman, the record establishes the following facts.  Ms. Lanman began working for the County as a deputy sheriff in 1987.  Beginning in March 2001, Ms. Lanman testified on deposition that some of her co-workers in the Classification Unit began treating her as if she were mentally ill, sometimes calling her "nuts" or "crazy."  She claims that when someone "hyped up on drugs" or "hostile" would be placed in a special holding cell (1A4), Deputy Judd Brungardt would tell her "Lanman, there is someone like you.  Go get your relative out of 1A4.  They act just like you."  She also testified Deputy Bernie Beletsky made comments like the following approximately once a week: "Oh Lanman, you are going off the deep end again," or "Let's give her some chocolate

---

[1]See Adams v. Am. Guar. & Liab. Ins. Co., 233 F.3d 1242, 1246 (10th Cir. 2000) ("Hearsay testimony that would be inadmissible at trial cannot be used to defeat a motion for summary judgment because 'a third party's description of a witness' supposed testimony is 'not suitable grist for the summary judgment mill.'" (citations omitted)).

and let's see her go off the deep end," and "Are you off your medication?," or "Why don't you try a different medication." When she approached Sergeant David Haney about an inmate with erratic and agitated behavior who Ms. Lanman thought was in a manic phase, Sergeant Haney told her "Are you okay? You're scaring me." Sergeant Haney also told her she had a "flat affect."

Ms. Lanman admitted that officers commonly teased each other, and that some of the comments made about her were good natured. She also admitted some officers disliked her, and that this was the reason she was ridiculed. Further, she thought some people disliked her because "[she] was the only female back in classifications . . . It was a boys club back there and [she] didn't fit in."

In April 2001, after Ms. Lanman had been working in Classifications for several years, she made serious errors misclassifying inmates, and she was transferred to Operations. Commenting on her transfer, she patted a fellow Classifications deputy on the cheek three times and said, "I sure am going to miss working with you Pieruccie. You are one of the nice ones that I had to work with." Deputy Pieruccie filed a written report of the incident saying her actions "confused [him] and made [him] feel very uncomfortable." Sergeant Haney also filed a written report claiming that on May 8, Ms. Lanman veered her vehicle back and forth in the parking lot as she drove towards him and Deputy Michael Jackson, and made a vulgar gesture. However, Deputy Jackson's report does not

corroborate Sergeant Haney's allegations, and Ms. Lanman denies the incident.

Based on these events, Ms. Lanman was placed on administrative leave on May 9, pending the results of a psychological fitness for duty exam. The treating physician found no signs she was unfit for duty and cleared her to return to work. She was never disciplined for the incidents reported by Haney or Pieruccie. Upon returning to duty on June 13, Ms. Lanman was interviewed by Captain Brett Cortright. They discussed her prior problems, and he told her she was starting fresh without regard to the past. Ms. Lanman became emotional and stated she did not understand why people thought so negatively of her. Captain Cortright told her she should consider quitting if things were not working out for her, and she was relieved from further duty that day due to her emotional state.

On June 18, Ms. Lanman reported for duty in her new unit and was assigned to work with a training officer. She confronted her supervisors about the assignment arguing that she was an experienced officer and did not need to be trained; however, the assignment was not changed. She then went to her duty station in the jail and yelled at her fellow officers in front of the inmates. As a result, she was suspended for three days without pay.

After taking almost a month of medical leave, Ms. Lanman was set to return to work in mid July. However, a few days before, the officers were informed at roll call that she would be returning and told that any concerns they

might have could be raised privately with the supervising sergeant. Upon hearing this had occurred, Ms. Lanman submitted her resignation stating she wanted to pursue other career opportunities, and she never returned to work. In a termination form given to the County, she further stated she "felt the need to voluntarily resign due to the extreme hostile conditions [she] faced repeatedly since 2001." She had never made any related written or oral grievances to the County. On August 7, Ms. Lanman filed a discrimination charge with the Equal Employment Opportunity Commission. She then filed suit against the County alleging violations of the ADA.

## Discussion

We review the district court's grant of summary judgment and its conclusions of law de novo, applying the same legal standard. Steele v. Thiokol Corp., 241 F.3d 1248, 1252 (10th Cir. 2001). Summary judgment is appropriate when "the pleadings, depositions, answers to interrogatories, and admissions on file, together with affidavits, if any, show that there is no genuine issue as to any material fact and that the moving party is entitled to a judgment as a matter of law." Fed. R. Civ. P. 56(c). Thus, to survive summary judgment the plaintiff has the burden to put forth sufficient evidence to warrant a verdict as a matter of law; a scintilla of evidence will not suffice. Anderson v. Liberty Lobby, Inc., 477 U.S.

242, 251 (1986). "When applying this standard, we view the evidence and draw reasonable inferences therefrom in the light most favorable to the non-moving party." Steele, 241 F.3d at 1252.

A.  Hostile Work Environment Claim under the ADA

Ms. Lanman asserts she was subjected to a hostile work environment in violation of the ADA. We have not previously decided whether a hostile work environment claim can be brought under the ADA. See Steele, 241 F.3d at 1252. For the following reasons, we join our sister circuits that have held such claims are actionable. See Flowers v. S. Reg'l Physician Servs. Inc., 247 F.3d 229 (5th Cir. 2001); Fox v. Gen. Motors Corp., 247 F.3d 169 (4th Cir. 2001); Shaver v. Indep. Stave Co., 350 F.3d 716 (8th Cir. 2003).

The ADA provides that no employer covered by the Act "shall discriminate against a qualified individual with a disability because of the disability of such individual in regard to . . . *terms, conditions, and privileges of employment*." 42 U.S.C. § 12112(a) (emphasis added). Congress borrowed this language from Title VII, which similarly provides that it "shall be an unlawful employment practice for an employer to fail or refuse to hire or to discharge any individual, or otherwise to discriminate against any individual with respect to his compensation, *terms, conditions, or privileges of employment*." 42 U.S.C. § 2000e-2(a)(1) (emphasis added). Since 1986, well before the ADA was enacted in 1991, the

Supreme Court has consistently held this language in Title VII encompasses a hostile work environment claim. E.g., Meritor Sav. Bank, FSB v. Vinson, 477 U.S. 57, 66 (1986); Harris v. Forklift Sys., Inc., 510 U.S. 17, 21 (1993). "Thus, we can presume that Congress was aware of the Court's interpretation of 'terms, conditions, or privileges of employment' when it chose to use parallel language in the ADA." Fox, 247 F.3d at 175-76. See Cannon v. Univ. of Chi., 441 U.S. 677, 696-97 (1979) ("It is always appropriate to assume that our elected representatives, like other citizens, know the law . . . ."). As such, Congress' incorporation of this language into the ADA is indicative of its intent that the language mean the same in the ADA as it does in Title VII.

The parallel purposes and remedial structures of the two statutes also support a consistent interpretation. Both statutes seek to eliminate employment discrimination against defined classes of people. Compare 42 U.S.C. § 12101(b) ("It is the purpose of [the ADA] to provide a clear and comprehensive national mandate for the elimination of discrimination against individuals with disabilities."), with Oscar Mayer & Co. v. Evans, 441 U.S. 750, 756 (1979) (stating purpose of Title VII is to eliminate workplace discrimination), and Jones v. Runyon, 32 F.3d 1454, 1456 (10th Cir. 1994) (same). Further, the ADA explicitly provides that "[t]he powers, remedies, and procedures set forth in [Title VII] shall be the powers, remedies, and procedures [the ADA] provides." 42

U.S.C. § 12117(a). Given these similarities, this court, and many others, have used similar analyses when interpreting the two statutes. See Bristol v. Bd. of County Comm'rs, 281 F.3d 1148, 1164 (10th Cir. 2002) (noting definition of employer substantially similar and applying Title VII cases in ADA context), *vacated in part on other grounds by* 312 F.3d 1213 (10th Cir. 2002) (en banc); Butler v. City of Prairie Vill., 172 F.3d 736, 744 (10th Cir. 1999) (noting reasons for precluding individual supervisor liability under Title VII apply equally to ADA); Roe v. Cheyenne Mountain Conference Resort, Inc., 124 F.3d 1221, 1230 (10th Cir. 1997) ("Congress' decision to incorporate in the ADA the remedies and procedures of Title VII cases is a clear indication, we think, that the statutory intent requirement for injunctive relief should be applied in harmony under the two acts."); see also Brown v. Brody, 199 F.3d 446, 456 n.10 (D.C. Cir. 1999) (listing cases) ("Courts of appeals routinely apply the same standards to evaluate Title VII claims as they do ADA claims . . . .").

In construing Title VII, the Supreme Court held, "The phrase 'terms, conditions, or privileges of employment' evinces a congressional intent to strike at the entire spectrum of disparate treatment of [gender] in employment." Vinson, 477 U.S. at 64 (internal quotations and citation omitted). After reviewing the similarities between Title VII and the ADA, nothing indicates that Congress intended disability-based employment discrimination to be treated any less

expansively. Thus, we hold that a hostile work environment claim is actionable under the ADA, and we now turn to whether Ms. Lanman has successfully established such a claim.

B.  Ms. Lanman's ADA Claim

The ADA is a "clear and comprehensive national mandate for the elimination of discrimination against individuals with disabilities." 42 U.S.C. § 12101(b)(1).  Thus, as a threshold matter, any plaintiff asserting a claim under the ADA must establish he or she is a "qualified individual with a disability." 42 U.S.C. § 12112(a); Steele, 241 F.3d at 1252.  "Disability" is defined by the ADA as "(A) a physical or mental impairment that substantially limits one or more of the major life activities of such individual; (B) a record of such an impairment; or (C) being regarded as having such an impairment." 42 U.S.C. § 12102(2).  Ms. Lanman claims she is disabled under (C) because the County "regarded" her as having a disability.

A person is regarded as disabled when "(1) a covered entity mistakenly believes that a person has a physical impairment that substantially limits one or more major life activities, or (2) a covered entity mistakenly believes that an actual, nonlimiting impairment substantially limits one or more major life

- 9 -

activities." <u>Sutton v. United Air Lines, Inc.</u>, 527 U.S. 471, 489 (1999).[2] In creating this category of disability, Congress recognized that "society's accumulated myths and fears about disability and disease are as handicapping as are the physical limitations that flow from actual impairment." <u>Id.</u> (quoting <u>Sch. Bd. of Nassau County v. Arline</u>, 480 U.S. 273, 284 (1987)). Because Ms. Lanman asserts she does not have any actual impairments, to survive summary judgment she must establish that a genuine factual issue exists regarding whether the County (1) mistakenly perceived her as being impaired, and (2) mistakenly believed the perceived impairment substantially limited at least one major life activity. <u>See</u> <u>MacDonald v. Delta Air Lines, Inc.</u>, 94 F.3d 1437, 1443 (10th Cir. 1996).

We think it doubtful that comments by non-supervisory co-workers about

---

[2]"Is regarded as having such an impairment" means:

(1) Has a physical or mental impairment that does not substantially limit major life activities but is treated by a covered entity as constituting such limitation;
(2) Has a physical or mental impairment that substantially limits major life activities only as a result of the attitudes of others toward such impairment; or
(3) Has none of the impairments defined in [the regulations] but is treated by a covered entity as having a substantially limiting impairment.

29 C.F.R. § 1630.2(l).

Ms. Lanman's mental health establish that the County mistakenly perceived her as mentally impaired.  See Roberts v. Unidynamics Corp., 126 F.3d 1088, 1093 (8th Cir. 1997).  Personality conflicts among coworkers (even those expressed through the use (or misuse) of mental health terminology) generally do not establish a perceived impairment on the part of the employer.  See Brunke v. Goodyear Tire & Rubber Co., 344 F.3d 819, 822 (8th Cir. 2003); Watson v. City of Miami Beach, 177 F.3d 932, 935 (11th Cir. 1999); Stewart v. County of Brown, 86 F.3d 107, 111 (7th Cir. 1996).

Nor does the County's order that Ms. Lanman take a fitness for duty exam show that Ms. Lanman was perceived as mentally impaired.  42 U.S.C. § 12112(d)(4)(A) (employer may order a medical exam when it is "shown to be job-related and consistent with business necessity"); Cody v. CIGNA Healthcare of St. Louis, Inc., 139 F.3d 595, 599 (8th Cir. 1998).  Ms. Lanman was a long-time employee with a good employment history who suddenly became involved in several troubling incidents affecting co-workers.  As the Eighth Circuit noted, "Employers need to be able to use reasonable means to ascertain the cause of troubling behavior without exposing themselves to ADA claims . . . ."  Cody, 139 F.3d at 599.  This is especially true in professions like law enforcement where employees are responsible for the care and safety of others.  See Krocka v. City of Chi., 203 F.3d 507, 515 (7th Cir. 2000); Watson, 177 F.3d at 935.

However, even if we were to conclude Ms. Lanman has sufficiently demonstrated that she was regarded as impaired, she simply has not shown a genuine issue of facts exists as to whether the County believed the perceived impairment substantially limited her in at least one major life activity. We resolve the case on this basis.

A person is substantially limited when he or she is either unable or significantly restricted in performing a major life activity that a person in the general population can perform without significant restriction. Doebele v. Sprint/United Mgm't Co., 342 F.3d 1117, 1130 (10th Cir. 2003); 29 C.F.R. § 1630.2 (j)(1). Likewise, "a person is 'regarded as having' an impairment that substantially limits the person's major life activities when other people treat that person as having a substantially limiting impairment." MacDonald, 94 F.3d at 1444 (citation and internal quotations omitted).

Ms. Lanman claims she was regarded as substantially limited in the activities of (1) working, (2) thinking, and (3) interacting with others. Working is a major life activity. Rakity v. Dillon Cos., Inc., 302 F.3d 1152, 1158 (10th Cir. 2002); 29 C.F.R. § 1630.2(i). However, we have not decided whether thinking and interacting with others are recognized major life activities. See Doyal v. Okla. Heart, Inc., 213 F.3d 492, 496 (10th Cir. 2000) (both); Steele, 241 F.3d at 1255 (interacting with others). For purposes of our analysis, we assume, without

deciding the issue, that they are.

An employee is perceived as substantially limited in working when the employer believes the employee "is unable to perform either a class of jobs or a broad range of jobs in various classes." Doebele, 342 F.3d at 1133. See also Sutton, 527 U.S. at 491-92. Here, while the County believed Ms. Lanman was unable to perform her duties in the Classifications Unit, as evidenced by her transfer, she was reassigned to a new position at her same rank. Further, after ordering her to take a fitness for duty exam, the County accepted the recommendation that she be cleared for duty and immediately allowed her to return to work. Cf. Doebele, 342 F.3d at 1134 ("The supervisors' disregard of the assessment and recommendations of Ms. Doebele's treating physician support the inference that their actions were improperly based on myth, fear, and stereotype, rather than an individualized evaluation of Ms. Doebele's abilities."). This behavior clearly shows Ms. Lanman was not perceived as unable to perform an entire class or broad range of jobs.

Assuming interacting with others is a recognized major life activity, "'mere trouble getting along with co-workers is not sufficient to show a substantial limitation.'" Steele, 241 F.3d at 1255 (citing McAlindin v. County of San Diego, 192 F.3d 1226, 1235 (9th Cir. 1999)). Thus, Ms. Lanman would have to show she was perceived by her employer as being unable to interact with

people in general on a regular basis. Id. The interactions she experienced with some of her co-workers do not satisfy this standard. Ms. Lanman had been working for the County for over 13 years. In that time, the only recorded problems between her and her co-workers occurred in the Spring of 2001. This does not establish a pattern of failure to interact on a regular basis. Had the County perceived her as substantially limited in her ability to interact, it would not have reassigned her to a position where she was required to work directly with inmates. Notifying other officers that she was returning to work and allowing them to voice their concerns at most shows she was viewed as undesirable to work with by some of her co-workers. The evidence before us is simply insufficient to show that she was regarded as substantially limited in interacting with people in general. Ms. Lanman also argues she was perceived as substantially limited in the activity of thinking. Again, assuming this is a recognized major life activity, the County's behavior does not support this conclusion.

Because Ms. Lanman has failed to establish that she was regarded as substantially impaired with respect to a major life activity, she is not disabled within the meaning of the ADA. Therefore, we do not address whether she was subjected to a hostile work environment or whether she was constructively discharged. Establishing a disability within the meaning of the Act is a threshold

requirement for all ADA claims.  <u>Steele</u>, 241 F.3d at 1252.  Ms. Lanman has failed to cross this threshold.  Thus, we need not go any further.

AFFIRMED.